633 F.2d 329
 JACKSON, Wayne, in his own behalf, on behalf of his
unemancipated minor son, and on behalf of all
others similarly situated, Appellant,
v.
O'BANNON, Helen, individually and in her capacity as
Secretary of the Department of Public Welfare of
Pennsylvania; Stovall, Don Jose, individually and as
Executive Director of the Philadelphia County Board of Assistance.
 No. 79-2296.
 United States Court of Appeals,
Third Circuit.
 Argued March 24, 1980.
Decided Sept. 11, 1980.
 
 Lawrence M. Schall (Argued), Stephen F. Gold, Community Legal Services, Inc., Philadelphia, Pa., for appellant.
 Jean E. Graybill (Argued), Mary Frances Grabowski, Asst. Attys. Gen., Dept. of Public Welfare, Harrisburg, Pa., for appellees.
 Before ROSENN, GARTH and SLOVITER, Circuit Judges.
 OPINION OF THE COURT
 SLOVITER, Circuit Judge.
 
 I.
 
 1
 The Department of Public Welfare of Pennsylvania (hereinafter DPW), the agency which administers that state's Social Security Act program of Aid to Families with Dependent Children (hereinafter AFDC), 42 U.S.C. §§ 601 et seq. (1976 & Supp. II 1978), has a policy which bars duplicate payments of AFDC benefits on behalf of a child who has moved to the home of another relative. Plaintiff filed suit against Helen O'Bannon, Secretary of the Department of Public Welfare of Pennsylvania, and Don Jose Stovall, Executive Director of the Philadelphia County Board of Assistance, claiming that this policy violates the Social Security Act, federal regulations issued thereunder, and the equal protection and due process clauses of the United States Constitution.[1] This is an appeal from the order of the district court granting summary judgment on behalf of defendants. We will affirm that judgment for the reasons set forth below.
 
 II.
 
 2
 Until the latter part of February, 1979, five year old Tarik Jackson lived in Philadelphia with his mother, Robin Jackson, who at that time was receiving AFDC benefits for herself and her four children. Tarik's father, Wayne Jackson, maintained a separate residence. Shortly before the events in question, Mr. Jackson's unemployment benefits terminated. Thereafter, on February 21, 1979, Tarik moved to his father's home. Mr. Jackson, who would not otherwise have qualified for AFDC benefits,[2] applied for those benefits on March 1, 1979, requesting a grant for himself as the caretaker parent and for Tarik as a dependent child. To confirm the change in Tarik's living arrangements, Mr. Jackson presented to the Welfare Department a notarized statement of Mrs. Jackson stating that on February 21, 1979 she had given Mr. Jackson "full custody of their son." Mr. Jackson was determined eligible for AFDC benefits for himself effective March 1, 1979. His grant at that time was not increased to include benefits on behalf of Tarik because Tarik's benefits had already been paid to his mother on February 27, 1979.[3] Pennsylvania's benefits are paid twice a month, prospectively for the coming period.
 
 
 3
 On the next semimonthly payment date, March 13, 1979, Tarik's grant of $51.00 was sent to his mother rather than his father, because DPW was complying with a requirement imposed judicially and by federal and state regulations that a recipient be given at least ten days' prior notice of an adverse action, which includes removal of a child's benefit. DPW sent the required notification of its intended termination of benefits for Tarik to Mrs. Jackson the day after it received initial notice of the change from Mr. Jackson. On March 28, 1979, DPW terminated the payment of benefits to Tarik's mother and, as of that same date, Mr. Jackson was paid the AFDC benefits on Tarik's behalf.[4]
 
 
 4
 Mr. Jackson claims that notwithstanding Pennsylvania's payment of Tarik's benefits to his mother, the state was bound to award him a grant on Tarik's behalf as of March 1, 1979, when he gave the state notice of Tarik's change in custody. It is the Pennsylvania policy precluding such duplicate payment which is the subject of the challenge in this lawsuit.
 
 III.
 
 5
 DPW concedes that it has a policy which prohibits duplicate payments on behalf of a child who is the subject of a change in custodial relative. That policy stems in part from a Pennsylvania regulation that provides no person may be a member of more than one AFDC grant group, Pa.Code tit. 55, § 171.21(b). Pennsylvania apparently considers children eligible for AFDC as one grant group with their custodial relative. Therefore, under Pennsylvania's policy, until Tarik could be removed from his mother's grant group, he could not be added to his father's grant group.
 
 
 6
 In order to consider the parties' respective contentions that the Pennsylvania policy either conflicts with or is consistent with the Social Security Act and its regulations, it is necessary to consider the structure of the AFDC program. It was succinctly described in King v. Smith, 392 U.S. 309, 316-17, 88 S.Ct. 2128, 2132-33, 20 L.Ed.2d 1118 (1968), and Shea v. Vialpando, 416 U.S. 251, 253-54, 94 S.Ct. 1746, 1750, 40 L.Ed.2d 120 (1974); the history behind some of the relevant provisions is discussed in King v. Smith, 392 U.S. at 320-26, 88 S.Ct. at 2134-2138. Under the Social Security Act, the federal government provides matching funds to assist participating states in providing financial assistance to needy dependent children and the parents or relatives who live with and care for them. States which desire to take advantage of such federal funds must submit AFDC plans in conformity with the Act and the regulations promulgated thereunder by the Department of Health, Education, and Welfare. The program is, however, administered by the states, which are given broad discretion in determining both the standard of need and the level of benefits. Shea v. Vialpando, 416 U.S. at 253, 94 S.Ct. at 1750.
 
 
 7
 HEW regulations require that each AFDC plan must specify a statewide standard of need, which is the amount deemed necessary by that state to maintain a hypothetical family at a subsistence level. Both eligibility for AFDC assistance and the amount of benefits to be granted an individual applicant must be based on a comparison of the state's standard of need with the income and resources available to that applicant, 45 C.F.R. § 233.20(a)(2)(i) (1979).
 
 
 8
 Each party to this dispute cites different sections of the Social Security Act and regulations issued thereunder in support of its position. Plaintiff relies primarily on 42 U.S.C. § 602(a)(7) (1976), and 45 C.F.R. §§ 233.20(a)(3)(ii)(D) and 233.90(a) (1979). The section of the Social Security Act he refers to provides, in relevant part:
 
 
 9
 (a) . . . A State plan for aid and services to needy families with children must . . .
 
 
 10
 (7) . . . provide that the State agency shall, in determining need, take into consideration any other income and resources of any child or relative claiming aid to families with dependent children . . . .
 
 
 11
 42 U.S.C. § 602(a)(7) (1976).
 
 
 12
 Under the regulations implementing this statutory section, it is required that:
 
 
 13
 (a) . . . A State Plan . . . must . . .
 
 
 14
 ((3))(ii) Provide that, in determining need and the amount of the assistance payment, . . .
 
 
 15
 (D) Net income available for current use and currently available resources shall be considered; income and resources are considered available both when actually available and when the applicant . . . has a legal interest in a liquidated sum and has the legal ability to make such sum available for support. . . .
 
 
 16
 45 C.F.R. § 233.20(a)(3)(ii)(D) (1979). Another regulation provides:
 
 
 17
 In establishing financial eligibility and the amount of the assistance payment, only such net income as is actually available for current use on a regular basis will be considered, and the income only of the parent (legally obligated to support the child under state law) will be considered available for children in the household in the absence of proof of actual contributions (.)
 
 
 18
 Id. § 233.90(a)(1).
 
 
 19
 Plaintiff stresses that these provisions manifest that one of the fundamental principles of the AFDC program is that eligibility for assistance and the payment of benefits are to be based upon actually available income. He claims that DPW knew that he had no income with which to support Tarik, and that at a conference before the district court on plaintiff's request for a Temporary Restraining Order, held on March 19, 1979, Tarik's mother advised the court that she no longer had the $51.00 she had received as assistance for Tarik on March 13, 1979. Therefore, he concludes, DPW's refusal to provide a grant for Mr. Jackson to meet Tarik's needs deprived him of income for approximately a month, in violation of the state's responsibility under the Act and regulations.
 
 
 20
 Plaintiff relies on a series of Supreme Court cases which held that state statutes and regulations which presumed income was available to an AFDC recipient that was not actually available conflicted with the Social Security Act and the regulations promulgated pursuant thereto. In King v. Smith, supra, the Court voided an Alabama regulation which regarded an able-bodied man with whom the mother cohabited as a "parent", thereby depriving the child of AFDC eligibility on that basis alone. In Lewis v. Martin, 397 U.S. 552, 90 S.Ct. 1282, 25 L.Ed.2d 561 (1970), the Court held that California could not presume that income of a non-adoptive stepfather or a man assuming the role of a spouse was available to a child. In Van Lare v. Hurley, 421 U.S. 338, 95 S.Ct. 1741, 44 L.Ed.2d 208 (1975), the Court reached a similar decision with regard to New York regulations authorizing a reduction in AFDC shelter allowance when non-rentpaying lodgers resided in the home.
 
 
 21
 According to plaintiff, Pennsylvania's regulation makes the impermissible presumption that Tarik's mother, the former caretaker relative, is providing for his support with the funds received. Since, plaintiff continues, the funds were not in fact available to Tarik, the line of cases referred to above forbids that presumption.
 
 
 22
 Defendants, for their part, direct our attention to the statutory provision which requires that "aid to families with dependent children shall . . . be furnished with reasonable promptness to all eligible individuals," 42 U.S.C. § 602(a)(10) (1976). They claim, and the district court found, that defendants met their statutory obligation by furnishing assistance to Tarik with reasonable promptness. Defendants were first notified of the change in Tarik's living arrangements on March 1, 1979. The payment dates for AFDC checks for both households, those of Robin Jackson and Wayne Jackson, were March 13 and March 28, 1979. Defendants were obliged, as a requirement of due process and the applicable federal and state regulations, to give Robin Jackson ten days' notice before her grant could be reduced.[5] Although she might have signed a waiver of that notice or consented to the action, she did not do so. Because checks are mailed a day in advance of the payment date, any changes in an assistance check must be made no less than two days before the date the check is due to be received. Therefore, defendants could not have processed the notice, waited the ten days, and effected the change in both checks by the March 13 payment date. Accordingly, they argue, March 28, 1979 was the earliest date by which the change could realistically be made, and that was in fact the date by which it was accomplished.
 
 
 23
 Defendants contend that their action is consistent with the federal regulation which provides that initial payments on behalf of a child who moves to the home of another relative are not available to the new household if benefits for a concurrent period are made to the former caretaker's household. The relevant regulation provides:
 
 
 24
 (2) Federal financial participation is available in:
 
 
 25
 (i) Initial payments made on behalf of a child who goes to live with a relative (as specified in the Act) within 30 days of the receipt of the first payment, provided payments are not made for a concurrent period for the same child in the home of another relative or as AFDC-FC;
 
 
 26
 (iii) Payments made for the entire month in the course of which a child leaves the home of a specified relative, provided payments are not made for a concurrent period for the same child in the home of another relative or as AFDC-FC(.)
 
 
 27
 45 C.F.R. § 233.90(c)(2) (1979).
 
 
 28
 Defendants argue that this regulation precludes federal reimbursement for duplicate assistance payments on behalf of any child to one specified relative for the same period for which that child has already received assistance paid to a different specified relative. They contend that this provision is designed to prevent potential welfare fraud, misuse of public funds, and overpayment of assistance which could be created by parents who move a child from one home to the other each month so that both parents can receive benefits. They argue that federal reimbursement would not be available for such duplicate payments, and that therefore Pennsylvania is not obliged to provide them.
 
 
 29
 Defendants emphasize that Tarik was not denied all benefits. In addition to some food stamps and a medical assistance card, DPW gave Tarik's father a supplemental payment of $32 which was the difference between Tarik's share in his mother's grant and Tarik's share in his father's grant. This differential arises because, under the Pennsylvania plan, increments in the family grant with the addition of each person to the household decrease as the family size increases.[6]
 
 
 30
 Plaintiff's view of the AFDC program would require that we choose between the important societal goal of protecting needy dependent children and the legitimate governmental interest in protecting the integrity of the welfare programs. We do not believe these two interests are irreconcilable, or that Pennsylvania's policy as applied to the facts in this case fails to adequately accommodate both interests.
 
 
 31
 The precedent on which plaintiff relies establishes that a presumption which has no basis in fact or law cannot be sustained. State statutes and regulations denying eligibility where the mother in a fatherless household cohabited with another man were invalidated as inconsistent with the Social Security Act because they presumed support which was not forthcoming and which the "substitute father" had no legal obligation to provide. Van Lare v. Hurley, supra, Lewis v. Martin, supra, King v. Smith, supra. We may assume, for analytic purposes, that Pennsylvania's policy operates in effect as a presumption that a former caretaker parent who has received a grant on the child's behalf will disburse those funds in the child's behalf. However, unlike the facts at issue in the Supreme Court cases, here the parent who received the grant had a legal obligation to support the child on whose behalf the grant was made.
 
 
 32
 In all of the above cases this factor was emphasized by the Court. In King v. Smith, the first of that line of cases, the Court held that Alabama could not equate the "substitute father" with the absent father. It said that "children of fathers living in the home are in a very different position from children of mothers who cohabit with men not their fathers: the child's father has a legal duty to support him, while the unrelated substitute father, at least in Alabama, does not. We believe Congress intended the term 'parent' in § 406(a) of the Act, 42 U.S.C. § 606(a), to include only those persons with a legal duty of support." 392 U.S. at 327, 88 S.Ct. at 2138. See also id. at 329, 88 S.Ct. at 2139. Similarly, in Lewis v. Martin, 397 U.S. at 560, 90 S.Ct. at 1286, the Court continued to observe the distinction, holding that even when the resource attributee is a stepfather, "California may not consider the child's resources to include either the income of a nonadopting stepfather who is not legally obligated to support the child as is a natural parent . . . ." In Van Lare v. Hurley, the Court summarized its holdings in the prior two cases as follows: "King v. Smith, supra, and Lewis v. Martin, supra, construe the federal law and regulations as barring the States from assuming that nonlegally responsible persons will apply their resources to aid the welfare child." 421 U.S. at 347, 95 S.Ct. at 1747 (emphasis added).
 
 
 33
 Thus, this case differs from the precedent relied on by plaintiff in two important respects. First, Mrs. Jackson was not a person without legal liability to Tarik. On the contrary, she was his mother and as such had a legal obligation to contribute to his support, whether or not he resided in her household, particularly when she was the recipient of government funds specifically designated for that purpose. Second, the presumption involved is one of application of government benefits, not independent income or resources as was true in the prior cases. Under the statute a minor cannot be given payments directly; there must always be a representative payee, usually the custodian, who is obliged to use the money received on behalf of the child. 42 U.S.C. § 606(b) (1976 & Supp. II 1978). The entire AFDC program relies on the integrity of the parent or custodian who is expected to disburse the child's grant in accordance with the statutory purpose. While there may be instances in which this statutory assumption is not realized in fact, the state is entitled to develop its plan according to the premise that parents or custodians will carry out their obligations. In this regard, Tarik stands on no different plane than a child living with a parent who has diverted funds meant for the child's use. When the state has reason to believe that payments are not being used "in the best interests of the child," the statute provides for a series of steps to be taken, including counseling and guidance, notice of possible substitution of custodian, appointment of a guardian or legal representative, or imposition of criminal or civil penalties. 42 U.S.C. § 605 (1976). Significantly, there is no provision for a duplicate payment to make up the deficiency even if the child is shown to be in need.
 
 
 34
 Although we do not agree with plaintiff that the specific provisions he cites compel the duplicate payments, neither do we agree with defendants that the regulation which they cite explicitly forbids such payments. The regulation, 45 C.F.R. § 233.90(c)(2) (1979), provides that federal financial participation will be available for payment to households in four discrete situations. Two of these four situations are (i) for a short period before a child goes to live with a specified relative and (iii) for a short period after a child has left the home of the relative.
 
 
 35
 There have been only scant references to this regulation in the reported cases, but they indicate that the regulation pertains to a situation inapposite here. In Burns v. Alcala, 420 U.S. 575, 95 S.Ct. 1180, 43 L.Ed.2d 469 (1975), the Court referred to the provisions of the regulation as authorizing "temporary aid, at the option of the States, to individuals in the process of gaining or losing eligibility for the AFDC program. For example, one of the accompanying rules authorizes States to pay AFDC benefits to a relative 30 days before the eligible child comes to live in his home. 45 C.F.R. § 233.90(c) (2)." Id. at 584-85. The rationale for the regulation which makes federal reimbursement available in instances where technical eligibility is not present has been explained as follows:
 
 
 36
 Under section 233.90(c)(2)(i), AFDC payments can be made to an eligible relative up to 30 days before the child is placed in the care of that relative. Since at the time a relative receives such payments he is not caring for a "dependent child," the payments are obviously beyond the statutory parameters. Just as obviously, however, such payments will enable the relative to purchase necessary food, clothing, toys and household items so that when the child does come into the relative's custody, proper care can begin immediately. Under section 233.90(c)(2)(iii), a relative can receive payments for an entire month, even if the child leaves the eligible family situation sometime during the same month. Again, technical eligibility may be lost with the child's departure, but not absent are the obligations to pay for major expenses, such as rent and furniture, incurred in part for the child's benefit. In addition, the regulation avoids administrative problems inherent in attempting to allocate payments for less than a month.
 
 
 37
 Parks v. Harden, 504 F.2d 861, 875 (5th Cir. 1974) (Ainsworth, J., dissenting) (footnotes omitted), vacated and remanded, 421 U.S. 926, 95 S.Ct. 1651, 44 L.Ed.2d 84 (1975).
 
 
 38
 Accordingly, the language of the regulation does not resolve the issue of construction presented here since it does not point decisively in either direction. Nor can we find much assistance in the statutory provisions and regulations cited by the plaintiff which require that eligibility and the amount of benefits be determined on the basis of actually available income. They are not determinative in this case because there is no issue of eligibility presented, since it is conceded that Tarik was eligible for assistance, and the amount established as his monthly benefit is not challenged. These regulations stem from the central principle of the aid program that a participating state may not deny aid to persons who come within the federal standard of eligibility. See Burns v. Alcala, 420 U.S. at 578, 580, 95 S.Ct. at 1184. In this case, however, the state did not deny aid to Tarik. Aid was given on his behalf to a legally responsible parent. Unlike the facts presented in Cooper v. Laupheimer, 316 F.Supp. 264 (E.D.Pa.1970) (three judge court), Pennsylvania is not reducing current payments to the child because of the mother's misappropriation of any payments. In that case the court held that withholding current benefits for past mistakes ignored the reality of public welfare the necessity of current payments for current needs.
 
 
 39
 The premise of the dissenting opinion is that "only Wayne Jackson's income may be considered in determining Tarik's eligibility for AFDC benefits." (dissenting op. typescript at 342). We believe the dissent misperceives the issue, since the issue is not whether Tarik was eligible for benefits, which he concededly was, but whether he was eligible for double benefits. Thus the regulation on which the dissent relies is inapposite since it applies by its terms only for the purposes of "establishing financial eligibility and the amount of the assistance payment," 45 C.F.R. § 233.90(a)(1), neither of which is at issue here. The Act requires that the states must furnish aid to a needy dependent child. We cannot read it to require that the state must furnish such aid twice.
 
 
 40
 There is some support for our view of the statutory scheme in the Secretary's regulation which authorizes federal participation in payments to households before the child arrives or after s/he leaves, 45 C.F.R. § 233.90(c) (2) (1979). Although we have found the literal language of that regulation inapplicable, we believe that the language of subsections (i) and (iii) permitting both the initial payment and the tag end payment only when "payments are not made for a concurrent period for the same child in the home of another relative or as AFDC-FC", id., reflects the Secretary's recognition of a Congressional desire that duplicate payments should not be knowingly made. If plaintiff is correct that the Act must be construed to require immediate duplicate payment once a child is transferred, albeit the transfer was a consensual one between parents, there may be an incentive to increase the number of relatively short term transfers in order to augment the total payments made to various family members.
 
 
 41
 This would undermine the state's efforts to make all reasonable efforts to preserve the financial integrity of the social welfare program. We have previously noted that, "Vigorous efforts to protect the integrity of welfare programs are necessary to assure that the public's dollars go only to those whose real need qualifies them to receive this money." Louise B. v. Coluatti, 606 F.2d 392, 402 (3d Cir. 1979). Congressional intent to prevent fraud is evident in the statutory provision making criminal the commission of a fraud with respect to the program. 42 U.S.C. § 1307 (1976). See Rush v. Smith, 573 F.2d 110, 112 (2d Cir. 1978). Regulations promulgated by the Secretary require states to establish and maintain methods to determine situations in which fraud may exist. 45 C.F.R. § 235.110 (1979). We believe intentional duplicate payments represent an unwarranted diversion of the program's funds similar to that which occurs in instances of fraud and that the Social Security Act should not be construed to oblige participating states to make such payments.
 
 
 42
 Plaintiff attempts to analogize this situation to that presented when the state duplicates payment of a check which has been reported lost or stolen.[7] The circumstances are not apposite, since in the latter instance there is no knowing duplication by the state. Plaintiff also raises the possibility that Pennsylvania's policy could operate to deprive the new custodial parent of the benefit of the child's payments for a lengthy period of time if the former parent chooses to appeal the change in the child's designee. That situation would be a matter of substantial concern, and would present a substantially different fact predicate than that which is before us.[8] The Act attempts to deal with defendant's hypothetical situation by requiring that payment be made with reasonable promptness, 42 U.S.C. § 602(a)(10) (1976). As we noted previously, here that statutory requirement was met.
 
 
 43
 In summary, we hold that Pennsylvania's policy which precludes duplicate payments does not violate the Social Security Act or it regulations when applied in the situation before us. We stress the following considerations: The transfer of Tarik between his parents was a consensual one. There was no finding that it was necessitated by any improper care in his prior household. Pennsylvania would have paid his benefits to his father on his behalf effective March 1, 1979 as requested had his parents either given Pennsylvania prospective notice of the impending custody change or had his mother waived the requirement of ten days' prior notice before a change in the check can be effected. That notice is a requirement of due process as enunciated both in Brown v. Wohlgemuth, 371 F.Supp. 1035, 1039 (W.D.Pa.), aff'd mem., 492 F.2d 1238 (3d Cir. 1974), and by the applicable state and federal regulations. Therefore Pennsylvania had no discretion to shorten the time in the absence of cooperation by the parents. The requirement of ten days' notice, together with one day to mail the notice, and two days thereafter to process the change in the name on the check, made it impossible for Pennsylvania to effectuate the change before the March 28, 1979 payment. Under the circumstances, that change was made with reasonable promptness. Tarik was never declared ineligible and his benefits were never cut off. Pennsylvania may validly presume that payments given to a legally obligated parent on behalf of the child will be used in accordance with that obligation. We see nothing in the statute that would require that Pennsylvania make another payment to Tarik's father on his behalf for the short period needed to protect the due process rights of the former custodian and to process the change in the name of the payee on the check.
 
 IV.
 
 44
 Our rejection of plaintiff's contention that Pennsylvania's policy violates the Social Security Act and regulations requires us to meet his claim that the policy also violates the due process and equal protection clauses of the Fourteenth Amendment, an issue which the district court did not address. Plaintiff claims that defendants employ a conclusive presumption that income being paid to a non-caretaker relative is available for the use of a child living in another household, and that this denies plaintiff due process of law. He also claims that Pennsylvania's scheme establishes a classification which violates equal protection of the laws because benefits are paid to a foster care family when the state removes a child from a home but not to a relative who obtains custody of a child.
 
 
 45
 We will resist the temptation to discourse at length on the recent trend towards merging the two distinct guarantees of individual rights provided by the due process clause and the equal protection clause. See Comment, Equal Protection and Due Process: Contrasting Methods of Review Under Fourteenth Amendment Doctrine, 14 Harv. C.R.-C.L. L.Rev. 529 (1979). We have recently had occasion to review the applicable legal principles. See Hopkins v. Kelsey-Hayes, Inc., 628 F.2d 801, at 811 (3d Cir. 1980), and Malmed v. Thornburgh, 621 F.2d 565, 569 (3d Cir. 1980).
 
 
 46
 Plaintiff's attempt to have us invalidate Pennsylvania's policy on the ground that it employs a conclusive presumption and therefore denies plaintiff due process of law is unavailing because the Supreme Court has indicated, in a recent line of cases, that the irrebuttable presumption analysis is inapplicable to challenges to aspects of social welfare programs. The Court, using a combined due process and equal protection analysis, identified the "rational basis test" as the appropriate scope of scrutiny. In Weinberger v. Salfi, 422 U.S. 749, 768, 95 S.Ct. 2457, 2468, 45 L.Ed.2d 522 (1975), the Court stated:
 
 
 47
 (T)he Due Process Clause can be thought to interpose a bar only if the statute manifests a patently arbitrary classification, utterly lacking in rational justification.
 
 
 48
 Thus, the Court has sustained welfare classifications, presumptions, and standards of need against constitutional challenge provided they have a rational basis. See Califano v. Aznavorian, 439 U.S. 170, 99 S.Ct. 471, 58 L.Ed.2d 435 (1978); Califano v. Jobst, 434 U.S. 47, 98 S.Ct. 95, 54 L.Ed.2d 228 (1977); Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). Using this relaxed standard of scrutiny, we see no difficulty in upholding Pennsylvania's policy. As we noted in the prior statutory discussion, it avoids the possibility of collusive arrangements between relatives, and it can also be viewed as encouraging planning for the child's custody.
 
 
 49
 Turning next to plaintiff's equal protection argument, we again must ask whether the classification is rationally related to a legitimate governmental interest. When Pennsylvania's justification is examined, it is apparent that there is indeed a basis for treating differently the payments of benefits when the child is placed in the custody of a foster care family and such payments when the child has been consensually transferred to the home of another relative. In the foster care family situation, it is unlikely that collusive arrangements will present any problem. Also, it is more likely that amicable arrangements to transfer benefits already paid can be made when the transfer is consensual than when the transfer is to a foster care family. Furthermore, the federal regulations make the distinction between placement with a foster care family and consensual transfer between parents since they provide that the ten day notice may be dispensed with when, inter alia, "An AFDC child is removed from the home as a result of a judicial determination, or voluntarily placed in foster care by his legal guardian," 45 C.F.R. § 205.10(a)(4)(ii)(G) (1979). There is no exception to notice covering the instant situation, and plaintiff does not suggest notice was not required.
 
 
 50
 Our decision in Medora v. Colautti, 602 F.2d 1149 (3d Cir. 1979), does not compel a different result. There we held that denial of benefits to persons who were blind, aged, or disabled for reasons unrelated to their need violated the equal protection clause. Here, there has been no denial of benefits on behalf of Tarik, and thus Medora is inapplicable.
 
 
 51
 For the foregoing reasons, we will affirm the judgment of the district court. Each party is to bear its own costs.
 
 GARTH, Circuit Judge, dissenting:
 
 52
 When a child of parents who are now separated is removed from the household of his mother to the household of his father, Pennsylvania, as a matter of policy and practice, will not commence making AFDC (welfare) payments to the child's new household, in this case the father's, until all payments made on behalf of the child to the prior household (the mother's) have been officially terminated. The majority upholds this Pennsylvania practice finding that the Commonwealth has achieved a reasonable accommodation between the Social Security Act's requirement that welfare recipients receive adequate, advance notice of reductions in benefits, and the practical fact that AFDC funds, although made on behalf of the child, must in fact be paid to an adult. The majority observes that the Pennsylvania procedure has the salutary effects of reducing welfare fraud and encouraging welfare recipients to plan carefully for custody transfers.
 
 
 53
 I cannot deny that there is a superficial appeal to the notion that duplicate or concurrent payments made on behalf of the same child should be avoided-indeed proscribed. Yet, however reasonable or even laudable the Pennsylvania procedure may be, it is plain that it conflicts with the clear requirements of federal law. See 42 U.S.C. §§ 601, 602 (1976); 45 C.F.R. § 233.90 (1979). Federal law requires that eligibility for benefits must be determined solely on the basis of the child's "need" which in turn must be measured solely with regard to the amount of income "actually available" for the child's benefit. Because Pennsylvania, by its procedure, imposes an additional requirement for AFDC eligibility beyond the requirements mandated as exclusive by federal law, it is apparent to me that Pennsylvania is thereby violating the supremacy clause of the United States Constitution. I therefore dissent from the majority opinion which declines to invalidate the Pennsylvania procedure and thus permits the imposition of a state devised formula to alter radically the scheme of an integrated federal program.
 
 I.
 
 54
 There is no dispute as to the essential facts in this case. The controversy concerns AFDC benefits granted on behalf of five year old Tarik Jackson whose parents are separated and who are both recipients of public assistance. Prior to February 21, 1979, Tarik had been living in a household with his mother and three others. Tarik's mother's welfare grant included AFDC benefits for Tarik. On February 21, 1979, Tarik changed homes, moving from his mother's household and custody into the household and custody of his father, Wayne Jackson, the appellant in this case.
 
 
 55
 Jackson applied for public assistance benefits for himself and Tarik on March 1, 1979. At that time, however, DPW denied Jackson's claim for benefits on Tarik's behalf, on the ground that benefits for Tarik had already been paid to Tarik's mother. DPW policy prohibited paying Tarik's benefits to his father until payments made on Tarik's behalf were officially excluded from the benefits paid to Tarik's mother. Unless Tarik's mother were to have waived the statutory notice provisions, this would entail a minimum ten day delay in the commencement of Jackson's additional benefits so that Tarik's mother could receive adequate, advance notice of her grant reduction.[1] Tarik's mother did not waive her statutory rights to notice, and, additionally, because of certain administrative delays, benefits paid to her on Tarik's behalf were not terminated until March 28, 1979[2] at which time Jackson began to receive the supplemental benefits to care for Tarik.[3] DPW does not contest the fact none of the monies paid to Tarik's mother in March, 1979 were actually spent on Tarik's behalf.
 
 
 56
 Jackson filed this complaint as a class action seeking an order enjoining and declaring invalid Pennsylvania's practice of withholding child benefit payments to a parent in his own situation pending termination of such benefits theretofore being paid to the prior custodial parent. He argued that, by its practice, Pennsylvania had imposed an additional condition on eligibility for welfare benefits which violated both the Social Security Act and the United States Constitution. On cross-motions for summary judgment, the district court, without certifying the class action, entered judgment in favor of DPW. Skipping over the essence of Jackson's statutory claims and rejecting his constitutional arguments sub silentio, the district court upheld the Pennsylvania practice after concluding that it did not engender unreasonable delays in the granting of benefits. Because I conclude that Pennsylvania has imposed an impermissible, additional requirement on eligibility which violates federal law, and that the district court has misread the relevant enactments, and the majority has refused to give effect to the plain meaning of the legislation, I would reverse the judgment of the district court and direct that summary judgment be entered in Jackson's favor.[4]
 
 II.
 A.
 
 57
 It is axiomatic that upon voluntarily electing to participate in a federal welfare program, a state becomes bound by the federal regulations governing that program. King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); Eder v. Beal, 609 F.2d 695 (3d Cir. 1979). Thus, DPW cannot prevail if its policy, which conditioned child benefit payments to Jackson on the termination of such payments to Tarik's mother, violates federal law.
 
 
 58
 The AFDC program, under which the grants on Tarik's behalf were made, was created by Congress
 
 
 59
 (f)or the purpose of encouraging the care of dependent children in their own homes or in the homes of relatives by enabling each State to furnish financial assistance and rehabilitation and other services, as far as practicable under the conditions in such State, to needy dependent children and the parents or relatives with whom they are living to help maintain and strengthen family life and to help such parents or relatives to attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection, there is authorized to be appropriated for each fiscal year a sum sufficient to carry out the purposes of this part. . . .
 
 
 60
 42 U.S.C. § 601 (1976) (emphasis added). The Congressional intent, as clearly expressed in the above section, is to foster child welfare and parental responsibility by providing aid to the actual family unit where the child resides. Therefore, it is not surprising that in determining eligibility for AFDC benefits states are directed only to consider income "actually available" to the child through the parent in the household where the child actually lives. The federal regulations provide:
 
 
 61
 In establishing financial eligibility and the amount of the assistance payment, only such net income as is actually available for current use on a regular basis will be considered, and the income only of the parent . . . (with a legal obligation of support) will be considered available for children in the household in the absence of proof of actual contributions; and
 
 
 62
 45 C.F.R. § 233.90(a)(1) (1979) (emphasis added). This regulation furthers the twin goals of the AFDC program as expressed in 42 U.S.C. § 601. By considering only income which is "actually available" to the child through the parent with whom he lives, it guarantees as much as possible that the child's needs will be met. And by focusing on the parent's obligation to children in his "household", the Act's emphasis on the protection of the family unit is furthered.[5]
 
 
 63
 When the federal regulations are applied in the context of the instant case, it is plain that only Wayne Jackson's income may be considered in determining Tarik's eligibility for AFDC benefits. Although the regulation specifies that a parent's income shall be attributed to his child, it makes clear that such attribution is only available to "children of the household" of that parent. In March, 1979 that "parent" was Wayne Jackson, Tarik's father-not Tarik's mother.
 
 
 64
 The majority offers no explanation or interpretation in its opinion which contradicts this clear and unequivocal meaning. Moreover, nothing appears in the statutes or regulations themselves which can lead to an interpretation contrary to the one I have set forth. Thus in order to reach a different result, (i. e. to authorize payments only to Tarik's mother with whom he is not living) and to escape from the plain meaning of the legislation, the majority, while acknowledging that the literal language of the regulations on which Pennsylvania relies is inapplicable, (maj. op. typescript at 14-15), nevertheless resorts to self-constructed goals to justify its conclusion. The majority opinion, in complete disregard of the federal regulations (45 C.F.R. § 233.90(c)(2)) holds that a perceived Congressional intent to prevent fraud and duplicative payments requires the payment of AFDC monies only to Tarik's mother, even though it is conceded that these monies were not used for Tarik's support. I cannot agree. For while I may sympathize with the objective that the majority seeks to attain, I cannot avoid the clear meaning and statement of the pertinent federal regulations. Under the regulation, the only way in which the monies paid to Tarik's mother could have affected Wayne Jackson's March 1, 1979 application for Tarik's benefits would have been if there was "proof of actual contributions" made by Tarik's mother for Tarik's support. It is stipulated that there was no such proof in this case.
 
 
 65
 Moreover, by conditioning the full grant to Wayne Jackson on the termination of payments to Tarik's mother, Pennsylvania, as a matter of policy, in effect presumes that Tarik's mother used the payments which she received for Tarik to contribute to Tarik's support. Such a presumption, which is implicit in the Pennsylvania policy, clearly violates the principle that only "actually available income" be used in determining eligibility for AFDC benefits. Furthermore, in this case it is admitted that Tarik's mother made no such contributions for his benefit even though she received the AFDC funds for that purpose.
 
 
 66
 The Supreme Court, on numerous occasions, has struck down similar presumptions which attributed income to welfare beneficiaries without proof that such income was actually available. See e. g. King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968) (states cannot attribute to children the income of a man who cohabits with the mother but who has no legal obligation of support); Lewis v. Martin, 397 U.S. 552, 90 S.Ct. 1282, 25 L.Ed.2d 561 (1972) (state cannot reduce benefits because of "male assuming role of spouse" who nonetheless has no support obligation); Van Lare v. Hurley, 421 U.S. 338, 95 S.Ct. 1741, 44 L.Ed.2d 208 (1975) (state cannot attribute income from presence of a "lodger" in the house).
 
 
 67
 The majority apparently reads these cases as authorizing the payment of benefits to any legally responsible parent even though the child does not reside in that parent's household and even though that parent admittedly does not utilize the AFDC payments for the child's welfare. In this respect I suggest that the majority errs. These cases hold no more than that a state presumption attributing income of a non-parent to a child residing in the non-parent's household, may not be sustained. They do not hold that just because an individual has the status of a parent and is therefore ostensibly legally responsible for a child, that the income of such a parent is correctly presumed to be attributable to the child where the income is concededly not used for the child and where the child resides in his other parent's household.
 
 
 68
 Not only do these cases fail to support the majority's opinion, analysis and conclusion, but the very structure of the AFDC program belies any presumption that an absent natural parent, even one having a legal obligation to support his child, will actually support the child. A needy child is considered "dependent" and hence eligible for assistance if he has been deprived of parental support by reason of the continued absence of a parent. 42 U.S.C. § 606(a). Only if the parent is present in the household (and physically and mentally able) does the presumption arise that a parent will fulfill his duty of legal support. Accordingly, the AFDC program is premised only on the presumption that the parent or custodian with whom the child lives will utilize the aid received for the child's benefit. To presume generally, as Pennsylvania and the majority presume, that absent parents will provide aid for their needy children receives no support from either the statutory scheme, case law or logic.
 
 
 69
 The majority has shown no reason why the presumption indulged in by Pennsylvania in this case should be struck down. Tarik's mother did not have custody over Tarik during March, 1979. She did not, in fact, use the monies which she received for Tarik's support during that month for Tarik's benefit, nor did she in any way contribute to his support. Thus, there is no basis or reason to presume at all, let alone to presume conclusively, that she would continue to contribute monies to a child who no longer lived with her. Accordingly, since the effect of the Pennsylvania practice is to presume conclusively that federal monies under a welfare program are in fact available to a child when, in fact, these funds may very well not be so available, the practice, and thus the presumption, must be invalidated as in conflict with federal law.
 
 B.
 
 70
 DPW contends that, its practice is justified, and in fact mandated, by federal regulations which prohibit "duplicative" AFDC payments. This total reliance based upon the federal regulation set out below is the only justification given by DPW for its refusal to pay benefits Tarik's father with whom Tarik was living. The majority evidently agrees with me, that the federal regulations do not prohibit duplicative payments in the present situation. Nevertheless, the majority upholds DPW's practice, a practice which depends upon finding a federal policy against duplicative payments in the following regulations:
 
 
 71
 2) Federal financial participation is available in:
 
 
 72
 (i) Initial payments made on behalf of a child who goes to live with a relative specified in section 406(a)(1) of the Social Security Act within 30 days of the receipt of the first payment, provided payments are not made for a concurrent period for the same child in the home of another relative or as AFDC-FC;
 
 
 73
 (iii) Payments made for the entire month in the course of which a child leaves the home of a specified relative, provided payments are not made for a concurrent period for the same child in the home of another relative or as AFDC-FC . . .
 
 
 74
 45 C.F.R. § 233.90(c)(2). Referring primarily to the proviso in the regulation that allegedly proscribes concurrent payments, DPW argues that it would not have been reimbursed by the federal government if it had made payments on Tarik's behalf to Wayne Jackson, before Tarik's mother's benefits were officially terminated.
 
 
 75
 In my view, a view that is shared by the majority (maj. op. typescript at 336), the regulations cited by DPW are inapposite. In the first instance, as respects the facts of this particular case, these regulations are simply irrelevant. Both subsections (i) and (ii) deal with situations where a child resides in two households during a single month and benefits are claimed by both household for that same month. Here, although Tarik left his mother and moved in with his father on February 21, 1979, Wayne Jackson did not apply for benefits until March 1, 1979. And it is undisputed that Tarik lived with his father for the entire month of March. Thus, Tarik's mother was not legitimately entitled to any benefits on Tarik's behalf during March. Therefore, since Wayne Jackson's application for benefits was limited to the month of March-a period when Tarik resided exclusively with his (Jackson's) household-these regulations are just not applicable.
 
 
 76
 Moreover, inasmuch as Jackson seeks a declaration of the invalidity of Pennsylvania's practice, it is appropriate to note that the regulations relied upon by DPW would not have barred payments to Wayne Jackson even if he had applied for benefits as of February 21, 1979. Upon analysis it is apparent that subsection (i) would have no bearing on this situation. Subsection (i) permits payments to a household for a 30 day period before a child moves in, so that the home can be made ready, so long as the previous home (from which the child is departing) does not receive payments for the same period. This regulation does not encompass the situation here, where the applicant seeks benefits starting after he takes custody of the child.
 
 
 77
 Subsection (iii) is similarly inapplicable. It permits payments to a home which a child leaves during the course of a given month (i. e., the home of Tarik's mother), so long as the new home (i. e., the home of Tarik's father) does not receive payments on behalf of the child for the same period. Here, however, benefits are being sought by the "new" home, not by the home which Tarik has left. Hence, this regulation does not deal with this situation.[6] See Burns v. Alcala, 420 U.S. 575, 584-85, 95 S.Ct. 1180, 1186, 43 L.Ed.2d 469 (1975).
 
 
 78
 Thus, the federal regulations relied upon by DPW are not only inapplicable to the facts of this particular case, but they provide no support for the Pennsylvania practice of prohibiting duplicative payments during the time necessary for official termination of benefits to a child's prior household. To obtain federal funding in this context, Pennsylvania is required to determine eligibility for AFDC benefits in accordance with the federal regulations which specify that reference may be had only to income that is actually available for the child's use.
 
 C.
 
 79
 Pennsylvania offers no other authority for engrafting onto the federal program its own requirement that duplicative payments be proscribed in a situation such as we have here. The majority as I have previously indicated suggests a general policy against the possibilities of fraud or concurrent payment. But, as I have already pointed out, we cannot permit our views or those of Pennsylvania to prevail in the face of federal statutory authority which mandates a contrary result. It is federal AFDC monies that are at issue in a federally funded integrated program. The flaws the majority perceives in the program can only be rectified by Congress and not by Pennsylvania or this court.
 
 
 80
 The majority lays great weight on what it considers to be the "reasonableness" of the Pennsylvania practice challenged here. Permitting duplicate payments, according to the majority, would facilitate welfare fraud. Moreover, the majority argues that the Pennsylvania practice has the salutary effect of encouraging families to plan for custody changes. These considerations, while admittedly important, are nevertheless improper grounds for decision in light of the clear conflict between the Pennsylvania practice and federal law. In effect, the majority concludes that Pennsylvania has remedied a defect in the federal law, and it upholds the remedy. But whether or not such a "defect" exists and whether or not the Pennsylvania practice constitutes an appropriate remedy are issues which must be dealt with by Congress or the federal regulatory agencies and not by this court. See King v. Smith, 392 U.S. at 332-33, 88 S.Ct. at 2141. There is little question that federal agencies could easily amend the regulation on which DPW purports to rely so as to prohibit the type of duplicative payments involved in this case. They have not done so. Similarly, Congress could amend its requirement that eligibility for AFDC benefits be determined solely by reference to actually available income so as to presume that the income of an absent parent is attributed to a child; it has not yet enacted such an amendment. Until these changes in the federal law are made, DPW is bound by the federal law as it now stands. Under current law, whatever its defects, the Pennsylvania practice cannot be countenanced.
 
 
 81
 Moreover, I am not as convinced of the "reasonableness" of the Pennsylvania practice as the majority appears to be. AFDC benefits are the last resort for support of a dependent child. Without them, the eligible child does without the basic necessities of life. In this very case, where Tarik's mother did not contest the reduction in her benefits, there was a one month delay before Tarik's new benefits began. During that time, Tarik received no AFDC monies. If Tarik's mother had contested her reduction, even on entirely frivolous grounds, it was conceded that such a contest could be protracted and benefits could be delayed for as long as one year.
 
 
 82
 It is no answer for the majority to say that such a situation is not before us, and therefore need not be considered (maj. op. typescript 338). If in order to bolster its position, the majority can foresee the possibility that fraud or collusion will result unless we sustain Pennsylvania's practice as a matter of policy, even though neither fraud nor collusion are present in this case, I cannot understand why the majority closes its eyes and refuses to face up to the very practical problem of protracted litigation, which can deprive eligible children of needed AFDC benefits for considerable periods of time. At oral argument this problem was explored at depth and was not considered hypothetical as the majority now characterizes it. Furthermore, it is stipulated in this record and it was admitted at oral argument, that Pennsylvania has no established procedure for dealing with the hardships which will be inflicted on children, such as Tarik, who receive no benefits during the period of such a delay. Accordingly, the "reasonableness" of a practice which results in paying only the wrong parent escapes me. I cannot understand why needy children, who are eligible for these benefits under federal law, must be refused AFDC benefits for substantial periods of time, particularly when the benefits are being denied in clear derogation of federal law.
 
 III.
 
 83
 In summary, because I conclude that the Pennsylvania practice, challenged in this case, is in complete contravention of federal law, and because I feel that it creates undue and unjustified hardship on children who are eligible for AFDC benefits, the only true beneficiaries of AFDC funds, I must dissent from the majority opinion. I would reverse the judgment of the district court and direct that summary judgment be granted in favor of the plaintiff, Wayne Jackson, and as indicated earlier, I would leave for District Court determination the certification of the class sought by Jackson.
 
 
 
 [1]
 Plaintiff's complaint alleges that the cause of action arises under 42 U.S.C. § 1983 and that there is federal jurisdiction pursuant to 28 U.S.C. § 1343(3). If plaintiff's constitutional claim is substantial, that section supports federal jurisdiction as to it and there would then be pendent jurisdiction over plaintiff's claim that Pennsylvania's policy conflicts with federal law. Hagans v. Lavine, 415 U.S. 528, 536, 94 S.Ct. 1372, 1378, 39 L.Ed.2d 577 (1974). "A claim is sufficient to confer . . . jurisdiction . . . if it is not 'wholly insubstantial' or 'wholly frivolous'." Williams v. Wohlgemuth, 540 F.2d 163, 166 (3d Cir. 1976). Unlike the constitutional claim in Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979), which rested only on the supremacy clause, here plaintiff alleges violations of the due process and equal protection clauses of the Fourteenth Amendment. Although we ultimately reject plaintiff's constitutional challenge, the specific question presented has not previously been ruled upon, nor has the Pennsylvania policy in question been the subject of any prior decision by this court. Accordingly, we find that the plaintiff has raised a substantial constitutional claim, that the district court had jurisdiction under 28 U.S.C. § 1343(3) (1976), and that we must first consider plaintiff's pendent statutory claim. Hagans v. Lavine, supra
 
 
 [2]
 The AFDC program provides benefits financed by the federal government to "needy dependent children and the parents or relatives with whom they are living." 42 U.S.C. § 601 (1976). These terms are defined in 42 U.S.C. § 606(a) and (c) (1976). Tarik was concededly a "dependent" child entitled to benefits. When Tarik moved in with his father, his father then became eligible for benefits on his own behalf as the relative with whom the dependent child was then living
 
 
 [3]
 Because DPW computes the amount of benefits on the basis of the number of members in a household, Mr. Jackson's two member household would have qualified for a monthly benefit of $247 ($164 for the father and $83 for Tarik). Jackson's assistance was therefore $83.00 per month less than it would have been had DPW included benefits for his son in the grant
 
 
 [4]
 Mr. Jackson formally petitioned the Philadelphia Family Court to grant him legal custody of his son on March 20, 1979. The court awarded him custody after holding a family conference in April
 
 
 [5]
 In Brown v. Wohlgemuth, 371 F.Supp. 1035, 1039 (W.D.Pa.), aff'd mem., 492 F.2d 1238 (3d Cir. 1974), the court held that DPW violated the rights of AFDC recipients to due process and under the applicable regulations when it terminated their regularly scheduled payment without affording them adequate notice
 The federal regulations provide:
 (4) In cases of intended action to discontinue, terminate, suspend or reduce assistance:
 (i) The State or local agency shall give timely and adequate notice. . . . Under this requirement:
 (A) "Timely" means that the notice is mailed at least 10 days before the date of action, that is, the date upon which the action would become effective;
 (B) "Adequate" means a written notice that includes a statement of what action the agency intends to take, the reasons for the intended agency action, the specific regulations supporting such action, explanation of the individual's right to request an evidentiary hearing (if provided) and a State agency hearing, and the circumstances under which assistance is continued if a hearing is requested(.)
 
 
 [45]
 C.F.R. § 205.10(a)(4)(i) (1979)
 The state code provides:
 ((b))(iii) . . . The Advance Notice ... will be mailed at least ten days before the proposed action is taken. This means that the following will occur:
 (A) For cash grants, the (notice) will be sent to the client promptly, but no later than ten calendar days before the telephone hold deadline of the payment date for the action decided on by the County Assistance Office.
 Pa.Code tit. 55, § 133.4(b)(iii).
 
 
 [6]
 See Pa.Code tit. 55, § 175.23(a). In Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), the Court upheld payment of a family maximum under regulations which provide that increments for additional family members become proportionately smaller until payments reach a state defined maximum grant level
 
 
 [7]
 Although Pennsylvania's regulations provide that the state will not issue replacement checks to recipients who have not received a check, lost an unendorsed check, or destroyed an endorsed or unendorsed check, they also provide that DPW may authorize from the Emergency Fund a one-time grant in the amount of the original grant if the nonreceipt was reported within a month of the date of the original check and the recipient is living in Pennsylvania. Pa.Code tit. 55, § 231.24(b)(1)(ii). Upon the report of a lost or stolen check an investigation is initiated by the relevant state department into the circumstances of the nonreceipt. Id. § 231.24(b)(1)
 
 
 [8]
 Plaintiff has alluded to evidence in the proceeding below that a change in designee in a family not a party to this suit was not effected for a substantial time. This suit, although purportedly filed on behalf of a class, was never certified as a class action. Neither party has raised the class issue on appeal, and therefore the only factual situation properly before us concerns the time lag with respect to Tarik and his father. We take this occasion to remind the district courts that Fed.R.Civ.P. 23(c)(1) requires that a class action determination should be made "(a)s soon as practicable after the commencement of an action brought as a class action" which ordinarily should be before a decision on the merits
 
 
 [1]
 See C.F.R. § 205.10(a)(4)(i). For a discussion of the importance and mandatory nature of the notice provisions of the Social Security Act see Eder v. Beal, 609 F.2d 695 (3d Cir. 1979)
 
 
 [2]
 Welfare payments in Pennsylvania are made prospectively, on a bi-monthly basis. DPW stated at oral argument that even though the ten day notice requirement had been met by March 12, the second March check payable to Tarik's mother had already been prepared by that date and included benefits for Tarik. Therefore, solely because of this administrative delay, under the Pennsylvania policy which prohibited duplicative payments, no benefits for Tarik were included in Jackson's second March, 1979 check
 
 
 [3]
 Jackson did receive some payments on Tarik's behalf during March, 1979. Under Pennsylvania's flat grant welfare system, the marginal increase in benefits decreases as additional persons are added to an assistance unit. Thus, Tarik was entitled to more benefits in his father's household than in his mother's, since Tarik's mother's grant included benefits for five individuals. Pursuant to an agreement reached before the district court on March 19, 1979, DPW paid Jackson $32, which represented this incremental amount. In addition, Jackson was given $10 in food stamps and a medical card for Tarik
 
 
 [4]
 Jackson complained that the Pennsylvania practice created an irrebuttable presumption in derogation of his rights under the due process clause of the fourteenth amendment to the United States Constitution. I am at a loss to understand how the district court could have granted summary judgment for the defendants without even addressing Jackson's constitutional claims. However, since I would hold that the Pennsylvania practice contravenes federal statutory law, I need not, and therefore do not, address the constitutional challenges raised by Jackson, although the majority does discuss these issues, but finds no constitutional violations
 Furthermore, as noted in text, the district court has yet to rule on Jackson's request for class certification. It is for the district court in the first instance to consider whether a class should be certified in this case.
 
 
 [5]
 The regulations make clear that the term household is used in the Act in its physical sense in reference to the place where the child actually resides and is cared for:
 (B) a home is the family setting maintained or in the process of being established, as evidence by assumption and continuation of responsibility for day to day care of the child by the relative with whom the child is living. A home exists so long as the relative exercises responsibility for the care and control of the child, even though either the child or the relative is temporarily absent from the customary family setting . . . .
 
 
 [45]
 C.F.R. § 233.90(c)(1)(v)(B)
 
 
 [6]
 Under the facts of this case, subsection (iii) permitted the payments to Tarik's mother for the entire month of February, 1979 even though Tarik moved into his father's household on February 21, 1979, because Wayne Jackson made no application for AFDC benefits in February. If Wayne Jackson had applied for benefits on February 21, and received payment therefore, under the analysis which I suggest, he would have been entitled to benefits on Tarik's behalf under 45 C.F.R. § 233.90(a)(1) which supplied the sole criteria for eligibility relevant to his application. But, in this event, had Tarik's father received payments for benefits commencing February 21, the payments to Tarik's mother for the last week in February would not have been authorized because of 45 C.F.R. § 233.90(c)(2)(iii)